Filed 5/13/14  P. v. Sims CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B244905 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396843) |
| v. | |
| KEITH SIMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Reversed.

Mark S. Devore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.

————————————————

Defendant was convicted by a jury of three counts of making criminal threats against his wife Yuliis Keaton and stepson Tamajae Lewis (Pen. Code, § 422, subd. (a))[1] (counts 1, 6, 7), one count of assault with a deadly weapon against Keaton (§ 245, subd. (a)(1)) (count 2), and one count of stalking against Keaton (§ 646.9, subd. (a)) (count 5). The jury found true that defendant personally used a knife on counts 1 and 2, and defendant admitted having suffered three prior prison terms (§ 667.5, subd. (b)).

Defendant argues on appeal that (1) the trial court erred in admitting evidence of his prior stalking conviction under Evidence Code section 1109; (2) his Sixth Amendment rights under the Confrontation Clause were violated by the admission of the victim's testimonial hearsay evidence to establish counts 1 and 2; (3) the trial court erred in failing to instruct on the lesser included offense of attempted criminal threats on count 6; (4) the true finding and sentence on the weapons enhancement attached to count 2 must be stricken; (5) the trial court erred when it refused defendant's request to conduct a *Marsden*[2] hearing; and (6) he did not knowingly waive his right to trial on his prior prison convictions alleged under section 667.5, subdivision (b). We reverse the judgment to permit the court to conduct a *Marsden* hearing. We recognize that after the trial court holds an appropriate *Marsden* hearing on remand, the judgment could be reinstated, and we thus consider defendant's remaining contentions.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

1. *Defendant's November 2006 Stalking Conviction*

The parties stipulated that on November 17, 2006, defendant was convicted of stalking Kerra Miller in violation of section 646.9, subdivision (a).

2. *Events Occurring in 2009*

During the summer of 2009, defendant, Keaton, and minors Tamajae Lewis (who is defendant's stepson) and Kyree (who is defendant's son) were living on Hoover Street.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

One day, Keaton wanted to smoke a cigarette. Tamajae went across the street to get a cigarette from a friend's mother, and gave Keaton the cigarette. When defendant saw it, he started hitting Keaton and threw her to the ground. Keaton told defendant to get off her, but defendant continued to hit her with his fists. Tamajae ran to the kitchen and got a knife and stabbed defendant in the back. Defendant threatened to kill Tamajae. While they lived on Hoover Street, defendant often would hit Tamajae.

During the summer of 2009, Tamajae ran away to his aunt's house because defendant was always "making insults" and fighting. Tamajae moved back to his mother's home, now on Western Avenue, in December 2010. At the time, defendant was not living there. After about eight months, defendant came back, and the violence against Keaton continued.

### 3. Incident of September 2011

Tamajae, who at the time was 13 years old and living with Keaton and his half-brother Kyree on Western Avenue, came home from school and observed that defendant and Keaton had been consuming alcohol. Defendant was in the living room and holding a page torn out of Keaton's diary that he was reading on the phone. Defendant was very angry. Keaton and defendant were arguing because defendant had read in Keaton's diary that she had been seeing another man.

Keaton went to take a shower. When she came out of the shower, defendant went into the bedroom and closed the door. Tamajae heard the bed squeaking and heard Keaton say, "'get off me'" and "'[l]et me go.'" Tamajae heard defendant say, "shut up" and that he was going to cut Keaton's "privates" with a CD. Tamajae, who was in the hallway outside the bedroom, yelled at defendant, "Get off my mom or I'm going to jack you up." Keaton opened the door to her bedroom and Tamajae could see she was crying. Defendant had a CD in his hand and looked "mad and confused." Tamajae ran into his bedroom. He could hear defendant through the closed door "cussing" at him. Defendant stated that if Tamajae came out of his room, defendant would "whoop [his] ass." Defendant sounded angry, and threatened to have a gang come after Tamajae.

3

Tamajae was afraid defendant would actually beat him and send a gang after him, and remained in his room with the door locked until the next day, and would not come out even for his uncle who wanted to take Tamajae to a church activity. Tamajae finally emerged from his room when Keaton told him to pack some clothes. As Keaton, Tamajae and Kyree drove away, defendant tried to get in front of their car. They went to Tamajae's grandmother's house and later to Tamajae's aunt Evalynne Moyo's house. Tamajae had seen defendant hit his mother before.

4. *Incident of November 4, 2011*

On November 4, 2011 about 11:00 p.m., Officer Martin Beck responded to a residence on Western Avenue, about half an hour after receiving a radio call of a disturbance. Gaell Keaton, Keaton's mother, had called 911 in response to a voicemail message she received from Keaton and sent police to Keaton's house on Western. Moyo, Keaton's sister, had called Gaell and then gone to Keaton's house. Moyo met the police when they arrived.

Upon first arriving on the scene, Officer Beck spoke to Moyo, who was on the sidewalk in front of the house next door. Moyo saw that Keaton was crying, and saw defendant behind the screened security door. She heard police telling defendant to open the door. Police asked Moyo to call Keaton out of the house. Officer Beck observed Keaton run outside the front door of the residence. She was "crying and hysterical." Keaton told Officer Beck that defendant put a knife to her throat and stated he was going to kill her, and that she was fearful for her life. In Officer Beck's estimation, it took about 10 to 15 seconds for Keaton to make those statements.

Officer Beck knocked on the front door of the residence. He could see through the front door screen that defendant was standing inside, holding a knife. Officer Beck ordered defendant to drop the knife. Defendant stated he was going to kill himself. Officer Beck again ordered defendant to drop the knife, but defendant ran out the back of the house. Officer Beck called for backup. Police set up a full perimeter of the area, called in an airship, and conducted a search, but were unable to apprehend defendant.

4

On January 22, 2012, police apprehended defendant at the Western residence.

The information filed June 8, 2012, charged defendant as follows: count 1, making criminal threats in violation of section 422, subdivision (a) (Nov. 4, 2011 threat to kill Keaton); count 2, assault with a deadly weapon, a knife, in violation of section 245, subdivision (a)(1) (Nov. 4, 2011 assault upon Keaton with a knife); count 5, stalking in violation of section 646.9, subdivision (a) (following and harassing Keaton between Sept. 1, 2011 and his arrest in Jan. 2012); count 6, making criminal threats in violation of section 422, subdivision (a) (Sept. 2011 threat to kill Tamajae); and count 7, making criminal threats in violation of section 422, subdivision (a) (Sept. 2011 threats against Keaton).[3]

The jury convicted defendant on counts 1, 2, 5, 6, and 7, and found the knife use allegations true. The trial court sentenced defendant to the upper term of five years on count 5, the base term, eight months (one-third the midterm of 24 months) on count 6, to run consecutively to the sentence on count 5, and further imposed one-year consecutive sentences for each of the three prior prison term allegations, for a total commitment of eight years eight months, with 544 days credit for time served. The court imposed and stayed sentence pursuant to section 654 the remaining counts, as follows: on count 1, the upper term of three years plus an additional year for the weapon enhancement; on count 2, the upper term of four years plus an additional year for the weapon enhancement; and on count 7, the upper term of three years.

## DISCUSSION

### I.    Admission of Defendant's November 2006 Prior Conviction for Stalking

Defendant contends the trial court erred in admitting under Evidence Code section 1109 the propensity evidence that he had suffered a prior stalking conviction in

---

[3] The information also alleged as count 3 criminal threats (§ 422) made against Keaton committed on January 22, 2012 and as count 4 assault with a deadly weapon (§ 245, subd. (a)(1)) against Keaton committed on January 22, 2012. Those counts were dismissed during trial.

November 2006 because the conviction was more than five years older than the facts underlying the current offense. Respondent argues that while Evidence Code section 1109 does not apply to defendant's prior conviction due to the definitions of the statute and the age of the evidence, the evidence was admissible under Evidence Code section 1101, subdivision (b) to prove defendant's intent to create fear in his victims.

### A.    *Factual Background*

Before trial, the prosecution sought to introduce evidence of defendant's prior stalking conviction of November 17, 2006. The prosecution intended to use the conviction as propensity evidence under Evidence Code section 1109, but did not intend to call any witnesses (including the victim, Kerra Miller) or delve into the underlying facts. Defendant objected to its admission, contending that the prosecution must introduce the substance of the prior act, and could not introduce just the fact of conviction. The court observed that *People v. Ogle* (2010) 185 Cal.App.4th 1138 determined that stalking is an act of domestic violence within the meaning of Evidence Code section 1109, but that the court was required to make a determination under Evidence Code section 352 and consider corroboration and remoteness in time; furthermore, under the Family Code section 6211 definition of "'[d]omestic violence,'" the act was inadmissible if the act occurred more than five years before the charged offense. The court stated it would admit the prior conviction solely with respect to the date of the conviction, the nature of the conviction, and the name of the alleged victim. The court further observed that propensity evidence in cases like the case before it was "extremely helpful and relevant" and concluded the probative value outweighed any potential prejudice given the limited information that would be given to the jury.

### B.    *Discussion*

Evidence Code section 1109 provides "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).)

6

Further, section 1109, subdivision (d)(3) provides, "'[d]omestic violence' has the meaning set forth in Section 13700 of the Penal Code.[4]  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211[5] of the Family Code, if the act occurred no more than five years before the charged offense."  Evidence Code section 1109, subdivision (e) prohibits the admission of prior bad act evidence that is more than 10 years old.  Thus, the evidence is admissible if the domestic violence as defined in section 13700 is not more than 10 years old, or if the domestic violence as defined in Family Code section 6211 is not more than five years old.

In *People v. Ogle*, *supra*, 185 Cal.App.4th 1138, the defendant was convicted of, among other things, criminal threats.  On appeal, he challenged admission of evidence of past misconduct.  The court found evidence that the defendant had previously stalked the victim was "indisputably admissible under [Evidence Code] section 1101, subdivision (b)

---

[4] Section 13700 provides in relevant part at subdivision (b), "'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."  Subdivision (a) provides that abuse is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."  Section 13700 does not define abuse to include stalking as defined in section 646.9.

[5] Section 6211 of the Family Code provides in relevant part, "'Domestic violence' is abuse perpetrated against any of the following persons:  [¶]  (a) A spouse or former spouse,  [¶]  (b) a cohabitant or former cohabitant," or a person with whom the defendant has had a dating relationship or a child.  (Fam. Code, § 6211, subds. (c), (d).)  "Family Code section 6203, subdivision (d) defines '[a]buse' to include 'engage[ing] in any behavior that has been or could be enjoined pursuant to Section 6320.' . . . Section 6320 authorizes the court to enjoin a party from 'stalking, threatening . . . harassing, [and] telephoning,' the other party.  Thus, stalking a former spouse is domestic violence for purposes of section 1109 as defined by Family Code section 6211." (*People v. Ogle*, *supra*, 185 Cal.App.4th at p. 1144.)

7

for the nonpropensity purpose of proving [the defendant's] intent and the sustained nature of his victim's fear, both of which were elements of the charged criminal threats offense." (*Id*. at p. 1143.)  Concluding that stalking was a form of domestic violence, the court found the evidence was also admissible under section 1109.  (*Ogle*, at p. 1144.)

Here, as respondent concedes, the prior conviction would be admissible only with respect to the offenses occurring before November 2011 because such offenses would fit within the Family Code definition and time limits; the section 13700 definition of domestic violence does not include stalking.  More importantly, the record does not indicate the relationship Kerra Miller had to defendant such that we can conclude the victim would fit the victim definitions of section 13700 or Family Code section 6211.

In order for the prior conviction to be admissible, we turn to other sections of the Evidence Code.  Evidence Code section 1109 states that it does not preclude the use of any other Evidence Code section governing the introduction of evidence.  (Evid. Code, § 1109, subd. (c).)  Thus, although evidence that a defendant committed misconduct other than that currently charged is generally inadmissible to prove he or she had a propensity to commit the charged crime (Evid. Code, § 1101, subd. (a)) such evidence is admissible if it is relevant to prove, among other things, intent, knowledge, identity, motive, or the existence of a common design or plan.  (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 400.)  "When reviewing the admission of evidence of other offenses, a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crimes evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant."  (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.)  Even if other crimes evidence is admissible under Evidence Code section 1101, subdivision (b), it should be excluded under Evidence Code section 352 if its probative value is substantially outweighed by undue prejudice.  (*People v. Thomas* (2011) 52 Cal.4th 336, 354.)  We review the trial court's evidentiary ruling for abuse of discretion.  (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

8

Here, the evidence of stalking against a different victim, was admissible to show defendant's intent to inspire fear in his victims. Stalking is an offense that requires a similar intent as criminal threats: the perpetrator must intend to "place [the victim] in reasonable fear for his or her safety, or the safety of his or her immediate family." (§ 646.9.) As a result, the evidence was highly probative on this issue and was minimally prejudicial because the facts of the underlying conviction were not delved into.

## II. Admission of Keaton's Statement That Defendant Had a Knife and Had Threatened to Kill Her

Defendant argues that the admission of Keaton's out-of-court statement made to Officer Beck while outside the Western Avenue residence was testimonial in nature and thus violated his Sixth Amendment confrontation clause rights. Respondent contends the statement was not testimonial because it was spontaneous and made during an ongoing emergency.

### A. *Factual Background*

At trial, defendant argued that Keaton's statement should be excluded because it was testimonial: the timeline indicated the 911 call had come in half an hour earlier; Keaton's statement was made in the past tense; and when the statement was made, Keaton was no longer in any immediate danger. The court responded that "[s]he is crying. She is hysterical. Her husband put a knife to her throat. She is fearful for her life. The man still has a knife in his hand when the officers go to the house. [¶] It's clear to me it's an ongoing situation. This was not testimonial in the court's view. I will allow the evidence."

### B. *Discussion*

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The phrase "witnesses against him" is not limited to in-court witnesses, but also applies to the admission of hearsay statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 50–51 [124 S.Ct. 1354, 158 L.Ed.2d 177].) The object of the confrontation

9

clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845 [110 S.Ct. 3157, 111 L.Ed.2d 666].)

In *Crawford v. Washington*, *supra*, 541 U.S. 36, the United States Supreme Court overruled *Ohio v. Roberts* (1980) 448 U.S. 56 [100 S.Ct. 2531, 65 L.Ed.2d 597], which had allowed out-of-court statements to be admitted at trial upon a showing of sufficient indicia of reliability. (*Crawford*, at pp. 60–67.) The Supreme Court concluded that with regard to nontestimonial hearsay, the *Roberts* approach was acceptable; such statements remain subject to state hearsay law and may be exempted from confrontation clause scrutiny entirely. (*Crawford*, at p. 68.) But where testimonial evidence is involved, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Ibid.*) The Supreme Court left for another day any effort to spell out a comprehensive definition of "testimonial." (*Id.* at p. 68.) However, it did state that testimonial statements are "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at p. 52.) The court stated that "at a minimum" the term "testimonial" applies "to police interrogations." (*Id.* at p. 68.)

In *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266, 165 L.Ed.2d 224], the Supreme Court elaborated on what constitutes testimonial statements to "determine more precisely which police interrogations produce testimony" subject to the confrontation clause. (*Id.* at p. 817.) In *Davis*, the trial court admitted into evidence a recording of the statements made by a domestic violence victim in response to a 911 telephone operator's questions, including circumstances at the house at the time of the call, the identity of the perpetrator, what he was doing, why he was at the house, whether he was armed, and a description of the assault. (*Id.* at pp. 817–818.) The Supreme Court concluded that the confrontation clause applied only to testimonial hearsay: "Statements are nontestimonial when made in the course of police interrogation under circumstances

objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.) Interrogations "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" are clearly testimonial, "whether reduced to writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer." (*Id.* at p. 826.) Interrogation during a 911 call is not testimonial because it is not designed primarily to establish or prove some past fact but to describe current circumstances requiring police assistance. (*Id.* at p. 827.) "We conclude from all this that the circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony . . . .'" (*Id.* at p. 828.)

More recently, the United States Supreme Court considered statements made by a victim "to police officers who discovered him mortally wounded in a gas station parking lot" and who did not know the perpetrator's location. (*Michigan v. Bryant* (2011) __ U.S. __ [131 S.Ct. 1143, 1150, 1156, 179 L.Ed.2d 93].) The court held that the statements were not testimonial and their admission did not violate the confrontation clause because the circumstances "objectively indicate[d]" that "the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.'" (*Id.* at p. 1150.) The court observed that "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. [Citation.]" (*Id.* at p. 1155.) "When . . . the primary purpose of [a police] interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause."

11

(*Ibid.*) In reaching its conclusion, *Michigan v. Bryant* established a "primary purpose" test. The "basic objective of the Confrontation Clause" is to "prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." (*Ibid.*) Where "a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (*Ibid.*) "The inquiry is . . . objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim . . . ." (*Id.* at p. 1161.)

Here, Keaton's statements were not testimonial within the meaning of *Crawford v. Washington*, *supra*, 541 U.S. 36 and *Davis v. Washington*, *supra*, 547 U.S. 813 and thus did not violate defendant's Confrontation Clause rights. The circumstances under which her statement was made indicated that she was trying to explain to the police the dangerousness of the situation in which she found herself, and these circumstances constituted an "ongoing emergency." Thus, her statement was not made for the purpose of substituting for an in-court statement, but for the purpose of warning Officer Beck that defendant was armed and dangerous. As a result, we find no error.

## III.    Lesser Included Instruction On Criminal Threats

Defendant contends the trial court erred in refusing to instruct on the lesser included offense of attempted criminal threats against Tamajae in count 6. He points to Tamajae's preliminary hearing testimony that defendant's threats "really didn't scare me"; thus, the jury could have concluded that defendant intended to place Tamajae in fear, but failed to do so. Defendant contends the error was prejudicial because the evidence clearly establishes that if given the opportunity, the jury could have found Tamajae's preliminary hearing testimony more credible. Thus, his conviction on count 6 should be conditionally reversed, with the People given the option of either retrying count 6 or accepting a modification of the conviction to attempted criminal threat, with remand for resentencing. Respondent contends there was insufficient evidence to support an attempt instruction

merely based on Tamajae's preliminary hearing testimony in light of the overwhelming evidence Tamajae was in fear for his well being after defendant made threats.

### A. Factual Background

Count 6 was based on defendant's conduct in September 2011 when Tamajae retreated to his room based on defendant's statements that he would "whoop [his] ass." During cross-examination, Tamajae admitted that during the preliminary hearing, he had testified that when defendant threatened to beat Tamajae's ass and "get the 40's on" him, "[it] didn't really scare me." Tamajae stated that he did not remember this testimony.

During the colloquy on proposed jury instructions, the prosecution requested an instruction on attempted criminal threats. The defense stated that it had never heard of an attempted criminal threat. The court responded, "Well, I presume [the prosecution] has some case authority for this. I just don't see it on the facts of this case. [¶] I know that Tamajae, when he testified, at one point it was suggested in cross-examination that he had said he wasn't affected by the defendant's statement, but then I thought you read another portion of his prior testimony where you said he was in fear. [¶] I just think you are going to make the case more confusing to the jury if we add an attempted criminal threat [instruction], even if the law supports it." The prosecution withdrew the request.

### B. Discussion

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Avila* (2009) 46 Cal.4th 680, 704–705.) Evidence is substantial for this purpose if it would cause a reasonable jury to conclude that the defendant committed the lesser but not the greater offense. (*Breverman*, at p. 162.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid.*) We apply a de novo standard of review to the trial court's failure to instruct on an assertedly lesser included offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

13

An uncharged crime is included in a greater charged offense if either (1) the greater offense cannot be committed without committing the lesser (the "elements test"), or (2) the accusatory pleading actually alleges all of the elements of the lesser offense (the "accusatory pleading test"). (*People v. Wolcott* (1983) 34 Cal.3d 92, 98.) To determine whether an offense is a lesser included, one of the two tests must be met. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) Error in failing to give lesser included instructions where required is reviewed under the *People v. Watson* (1956) 46 Cal.2d 818, 836 standard of harmless error. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.)

Generally, "[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) The underlying crime here is criminal threat, as defined in section 422,[6] which crime has five analytic elements. (*In re George T.* (2004) 33 Cal.4th 620, 630; *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).) To prove the offense, the prosecution must establish that: (1) "the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person'"; (2) "the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out'"; (3) "the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of

---

[6] Subdivision (a) of section 422 provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

purpose and an immediate prospect of execution of the threat'"; (4) "the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) "the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Toledo*, at pp. 227–228.)

The leading case regarding attempted criminal threat is *Toledo*, *supra*, 26 Cal.4th 221. There, following a domestic dispute, the defendant was charged with making criminal threats to his wife, and assault with a deadly weapon on his wife and a neighbor. (*Id*. at pp. 224–226.) Although the wife told investigating officers that the defendant's threats to her placed her in fear, at trial she denied that they did so. (*Id.* at p. 225.) After the jury received instructions on criminal threat and attempted criminal threat, it found the defendant guilty of the latter offense. On appeal, the defendant maintained that there is no such crime as attempted criminal threat, arguing, inter alia, that it would improperly subject speech protected by the First Amendment of the United States Constitution to punishment. (*Id*. at pp. 226, 233.) In rejecting the contention, *Toledo* examined the origins of the crime of criminal threat, described the specific intent required for attempted criminal threat, and identified some situations that would support that offense. As the court noted, the former version of section 422, which defined the crime of terrorist threat, made it an offense to willfully threaten a crime that would result in death or great bodily injury, with the specific intent to terrorize another person, thereby causing that person "'reasonably to be in sustained fear for his or [her] or their immediate family's safety . . . .'" (*Toledo*, at p. 228.) In *Toledo*, the Supreme Court observed that the Legislature, in enacting the current version of section 422, incorporated this restriction in element (3) of the offense, and thus imposed punishment only on threats beyond the protection of the First Amendment. (*Toledo*, at pp. 229, 233.) Generally, such threats are identified by reference to a "reasonable person" standard: "'When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection.'" (*Id.* at p. 233, italics omitted.)

15

In *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 604–605, a petition was filed charging a minor with criminal threat. At the hearing on the petition, evidence was presented that the minor made a serious and sincere threat to kill another person, but no evidence was submitted to show that the victim experienced sustained fear as a result of the threat. (*Id.* at pp. 605–609.) The juvenile court nonetheless found the criminal threat allegation to be true, but in view of the gap in the evidence, the appellate court modified the finding to reflect that the juvenile's offense was attempted criminal threat. (*Id.* at pp. 610–611.)

Here, insufficient evidence supports the giving of the instruction. Aside from Tamajae's isolated preliminary hearing testimony, Tamajae testified unequivocally at trial he was afraid defendant would actually beat him and send a gang after him, and remained in his room with the door locked until the next day, and would not come out even for his uncle who wanted to take Tamajae to a church activity. Tamajae finally emerged from his room when Keaton told him to pack some clothes and he could leave the house.

## IV. True Finding On the Weapons Enhancement Attached to Count 2

Defendant contends the true finding on the weapons enhancement attached to count 2 (assault with a deadly weapon, § 245, subd. (a)(1)) must be stricken because the use of a weapon is an element of the offense. Respondent concedes this point.

### A. *Factual Background*

The information alleged as to counts 1 and 3 (violations of § 422) that defendant personally used a deadly weapon, a knife, in the commission of those crimes, and that the use of such a weapon was not an element of the offense (§ 12022, subd. (b)(1)). After count 3 was dismissed during trial, however, the proposed verdict form contained a true finding for the deadly weapon enhancement on count 2 (assault with a deadly weapon). During discussion of the jury instructions and verdict forms, defense counsel requested the enhancement be removed from count 2. The court responded, "my feeling is that we should conform to proof, and since it is a serious felony, if the defendant personally used a knife, I think that the verdict form should reflect that just so that down the line people

16

don't have to look at the transcript of the case.  [¶]  I don't see that there is any harm to the defendant by having a personal use allegation, and so I'm going to give it as to count two."  The court imposed and stayed a one-year enhancement pursuant to section 12022, subdivision (b)(1) on count 2.

### B.     Discussion

At the time of the charged offense, former section 245, subdivision (a)(1) provided, in relevant part, "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three or four years . . . ."[7]  Former section 12022, subdivision (b)(1) provided, "Any person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

In *People v. McGee* (1993) 15 Cal.App.4th 107, the defendant stabbed the victim with a knife and was charged with assault with a deadly weapon and by force likely to produce great bodily injury, with a section 12022, subdivision (b) enhancement.  The jury convicted McGee and found the enhancement true, and the trial court imposed the enhancement.  (*Id*. at pp. 109–110.)  *McGee* noted that although section 245, subdivision (a)(1) "can be violated without necessarily using a deadly weapon," the "section 'defines

---

[7] Effective January 1, 2012, the statute broke apart these two ways of committing an assault into separate subsections:  Assault with a deadly weapon other than a firearm remains in section 245, subdivision (a)(1), while assault by means of force likely to produce great bodily injury is found in section 245, subdivision (a)(4).  (Stats. 2011, ch. 183, § 1.)  The legislative history indicates the amendment was designed to ameliorate confusion arising in assessing prior convictions because "[a] prosecutor will see 'PC § 245(a)(1)' on a defendant's rap sheet and not know if it was an assault with a deadly weapon or an assault likely to produce great bodily injury."  (Assem. Com. on Pub. Safety, Rep. on Assem. Bill No. 1026 (2011–2012 Reg. Sess.) as introduced Feb. 18, 2011, pp. 1–2.)

17

only one offense, to wit, "assault upon the person of another with a deadly weapon or instrument [other than a firearm] or by any means of force likely to produce great bodily injury . . . ."  "Consequently, in determining whether use of a deadly weapon other than a firearm is an element of a section 245, subdivision (a)(1) conviction, the question is not simply whether, in the abstract, the section can be violated without using such a weapon. Rather, the conduct of the accused, i.e., the means by which he or she violated the statute, must be considered." (*McGee*, at pp. 114–115.)  *McGee* further explained, "If prosecutors were permitted to divide section 245, subdivision (a)(1) into two separate offenses regardless of the defendant's conduct, as did the prosecutor in this case, similarly situated defendants who assaulted their victims with deadly weapons other than firearms and were charged with violating section 245, subdivision (a)(1) could receive disparate punishment depending solely upon the language used in the pleadings.  The one accused of assault with a deadly weapon would not be subject to the enhancement under section 12022, subdivision (b) while the one accused of assault by means of force likely to cause great bodily injury would be subject to the additional punishment.  This is an absurd and unjust result which is inconsistent with the legislative intent in enacting sections 245, subdivision (a)(1) and 12022, subdivision (b)." (*McGee*, at p. 117.)

Here, we agree with defendant that because the use of a deadly weapon was an element of the offense, the enhancement imposed on count 2 pursuant to section 12022, subdivision (b)(1) must be stricken.

## V.    *Marsden* **Motion**

Defendant asserts that the trial court erred in denying to conduct a *Marsden* hearing after defendant advised the court he had new evidence that could lead to a new trial.  He argues the error violated his Sixth Amendment right to counsel, was prejudicial per se because the nature of the error precludes meaningful appellate review of its prejudicial impact, and was not untimely as a defendant has a right to bring a *Marsden* motion even after trial has concluded.  He requests that we conditionally remand the matter to the trial court.

18

## A.    *Factual Background*

Before sentencing, defense counsel advised the court that defendant wanted to "either have a *Marsden* motion or go pro per as there are additional motions he would like to bring before this court that I do not believe have legal value . . . ." The court responded, "I think it's too late. We're going to go ahead and sentence. I'm not going to hear a *Marsden* motion on the day of sentencing." Defendant stated that he had new evidence that could be the basis for a new trial. The court responded, "bring it up in a habeas corpus because I think you've been well represented in this. I don't really want to hear your new information at this time. [¶] . . . [¶] . . . if you have evidence that you think is sufficient to acquit, then you put it in a habeas corpus and file it with the court and I'll consider it."

## B.    *Discussion*

The duty to conduct a *Marsden* inquiry arises only when the defendant asserts his counsel's performance has denied him his constitutional right to effective counsel. (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787.) "A trial court errs under *Marsden* by not affording a criminal defendant the opportunity to state all his reasons for dissatisfaction with his appointed attorney." (*People v. Vera* (2004) 122 Cal.App.4th 970, 980.) "'''''A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.''''''" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) A defendant does not have a right to an appointed attorney who will conduct the defense in accordance with the defendant's wishes. (*People v. Lucky* (1988) 45 Cal.3d 259, 281.) Furthermore, tactical decisions are made by counsel, and disagreements over those decisions, in themselves, do not constitute an "irreconcilable conflict" for purposes of *Marsden*. (*People v. Welch* (1999) 20 Cal.4th 701, 728–729.)

As stated in *People v. Reed* (2010) 183 Cal.App.4th 1137, 1148: "a trial court's failure to conduct a postconviction *Marsden* hearing is harmless where the defendant "has

made no showing . . . either that his *Marsden* motion would have been granted had it been heard, or that a more favorable result would have been achieved had the motion in fact been granted." We review the denial of a *Marsden* motion for abuse of discretion. (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1085.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" (*People v.* Taylor (2010) 48 Cal.4th 574, 599.) We review the trial court's erroneous denial for prejudice under the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)

Here, we find the trial court erred in failing to conduct a *Marsden* motion. There is no offer of proof or statement by the defendant or his attorney concerning the subject matter of his new trial motion from which we can conclude beyond a reasonable doubt that the defendant's new trial motion would have been unmeritorious. Thus, we cannot assume that counsel's refusal to bring the motion was based upon counsel's rendering of adequate representation, or that it amounted to no more that a disagreement concerning tactical choices about whether the bringing of a new trial motion was warranted under the circumstances. We therefore reverse based on the failure to hold a *Marsden* hearing, and order that the trial court conduct a *Marsden* hearing. If the court finds defendant's *Marsden* motion is meritorious, the court is to permit defendant to substitute counsel and is to hold a hearing on defendant's motion for new trial based on asserted error to determine if there is a reasonable probability the result at trial would have been different but for any asserted error. If defendant's new trial motion is meritorious, the trial court is to conduct a new trial. If the *Marsden* motion, and any new trial motion brought are denied, then defendant's conviction is affirmed as modified to strike the section 12022, subdivision (b)(1) enhancement.

## VI. Waiver of Trial On Defendant's Prior Convictions

Defendant contends the trial court did not adequately inform him of his right to have a jury trial on his prior convictions, and as a result, he did not knowingly and intelligently waive his rights on his prior prison terms. We disagree.

### A. Factual Background

The information alleged that defendant had four prior prison terms under section 667.5, subdivision (b). Trial on the prior prison terms was bifurcated. At the time the jury was deliberating, the court informed defendant that if the jury found him guilty, defendant would have the right to have the jury determine the fact of the prior convictions. The court explained to defendant that "most defendants . . . waive their right to a jury on the issue of proof of the priors, and if you are convicted, we will have a court trial at the time of sentencing, and we will take it up then. [¶] Why don't you talk it over with [defense counsel] and see what your thoughts are." The record indicates that defendant and counsel conferred. Defense counsel stated, "You spoke with my client. He is inclined to waive jury as to the priors." The court asked defendant, "You're okay with that, letting me decide if the prosecution can prove that you [committed] these priors?" Defendant filed a brief in which he argued that in spite of the four terms alleged, he only suffered three prior prison commitments: One of the prior convictions resulted in five years' probation and 365 days in jail, but because he violated his probation in that case, he was sentenced to prison and served his term concurrently with one of the other prison terms alleged in the other priors.

However, when it came time to determine the fact of defendant's prior prison terms, the court advised defendant, "You . . . have the right to challenge whether or not you are the person who was convicted of those offenses. The People would be required to prove to me beyond a reasonable doubt that you do have these prior convictions. They will add one year for each conviction to the sentence that I'm about to impose. [¶] But I ask you, were you the person who was so convicted," to which defendant responded,

"Yes." The court turned to defense counsel and asked, "and counsel, do you join in the plea and the waivers," to which counsel responded, "Yes."

### B. Discussion

Before a trial court accepts a defendant's admission to a prior conviction allegation, the court must enumerate for the defendant the three rights that the defendant is waiving (i.e., to a jury trial, to remain silent, and to confront witnesses), and must obtain waivers of these rights from the defendant. (*People v. Mosby* (2004) 33 Cal.4th 353, 356, 359–360.) If an express waiver of these rights is not secured from the defendant, reversal is required unless the record as a whole shows the admission was voluntary and intelligent under the totality of circumstances. (*Id*. at pp. 360–361.) The question is whether the defendant's admission was intelligent and voluntary "because it was given with an understanding of the rights waived." (*Id*. at p. 361.)

In *People v. Mosby*, *supra*, 33 Cal.4th at p. 361, our Supreme Court addressed the process a reviewing court should follow to assess whether the defendant's "admission of [a] prior conviction was intelligent and voluntary in light of the totality of circumstances" in those cases where "the transcript does not reveal complete advisements and waivers." In such cases, the court must examine "the whole record, instead of just the record of the plea colloquy" to determine whether the "admission . . . was intelligent and voluntary in light of the totality of circumstances." (*Ibid*.) The factors the court can consider include the defendant's participation in a trial immediately prior to entering a plea and the defendant's prior experience in the criminal justice system from which he may have learned of his constitutional rights. (*Id*. at p. 365.)

In *People v. Mosby*, *supra*, 33 Cal.4th 353 the court further held that previous experience with the criminal justice system indicates greater sophistication regarding legal rights. (*Id*. at p. 365.) The record here shows that defendant had at least four felony convictions, each of which necessarily involved either a trial or a plea during which defendant received further practical education about his constitutional rights. (See *id*. at p. 365.) This fact, coupled with the limited advisement the court gave defendant about

his right to a jury trial on the priors during deliberations and the court's advisements concerning the prosecution's burden of proof on the prior allegations, we conclude under the totality of the circumstances that defendant knowingly waived all trial rights concerning his prior prison terms.

## DISPOSITION

The judgment is reversed. The trial court shall conduct a *People v. Marsden* (1970) 2 Cal.3d 118 hearing. If the court finds defendant's *Marsden* motion is meritorious, the court is to permit defendant to substitute counsel and is to hold a hearing on defendant's motion for new trial based on asserted error to determine if there is a reasonable probability the result at trial would have been different but for any asserted error. If defendant's new trial motion is meritorious, the trial court is to conduct a new trial. If the *Marsden* motion, and any new trial motion brought are denied, then the judgment shall be reinstated as modified by striking the Penal Code section 12022, subdivision (b)(1) enhancement and the one-year term imposed for it; further, the clerk of the superior court shall prepare an amended abstract of judgment to reflect this modification, and forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


JOHNSON, J.


I concur:


CHANEY, J.


23

Rothschild, Acting P.J., concurring and dissenting.

I concur in the opinion except for Part III in which the majority finds no error in the trial court's failure to instruct the jury on the lesser included offense of attempted threats against Tamajae. In my view there was sufficient evidence to warrant that instruction.

Tamajae testified at trial that after Sims threatened to "whoop [my] ass" and send the 40's gang after him, "I stayed in my room because I was scared." He also testified that as soon as Sims finished making those threats, "I went to sleep." To impeach Tamajae's claim that Sims's threats frightened him, Sims's counsel read from the transcript of Tamajae's testimony at the preliminary hearing. Question: "'When [Sims] threatened to beat your ass and get the 40's on you, did that scare you?'" Answer: "'Uh, no. It really didn't scare me.'"

Based on Tamajae's conflicting testimony about whether he felt fear and his testimony that after hearing Sims's threats he went to sleep a jury could reasonably find that Tamajae did not experience "sustained fear," or any fear at all, as necessary to convict Sims of making a criminal threat. Therefore, the court erred in not instructing the jury on attempted criminal threats.


ROTHSCHILD, Acting P. J.